UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

JARVIS MERRICK,

        Plaintiff,

-vs-                             Case No.  5:08-cv-60-Oc-10GRJ

RINKER MATERIALS OF FLORIDA, INC.,
a Florida corporation, RINKER MATERIALS
CORPORATION, a Florida corporation,
FLORIDA CRUSHED STONE COMPANY,
a Florida corporation,

        Defendants.
_____

## **O R D E R**

On February 11, 2008, the Plaintiff, a 76-year old commercial truck driver, filed a two-count Complaint against his alleged former employers claiming wrongful termination in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621, *et seq.* ("ADEA"), and the Florida Civil Rights Act of 1992, Fla. Stat. § 760, *et seq.* ("FCRA") (Doc. 1).  The case is presently before the Court for consideration of the Defendants' Motion for Summary Judgment, (Doc. 21), to which the Plaintiff has filed a response in opposition (Doc. 23).  The Court concludes that the Motion is due to be denied.

## **Undisputed Facts**

### I.    The Parties.

Tri-State Carriers ("Tri-State") was a privately-owned Florida company engaged in the business of providing transportation and hauling services.  Defendant Florida Crushed

Stone ("FCS") was the original owner of Tri-State, and in 2000, Defendants Rinker Materials of Florida, Inc., and Rinker Materials Corporation (collectively "Rinker") acquired FCS and Tri-State. At various times relevant to this case, the Defendants have operated under the names Rinker Materials Corporation, Florida Crushed Stone Company, and Tri-State Carriers.

On February 6, 2004, Plaintiff Jarvis Merrick applied for a commercial truck driver position with the Defendants. At that time, Merrick was 71 years old. Merrick interviewed with Steve Piermatteo, the Brooksville, Florida Terminal Manager, and Safety Manager Frank Byrne. On his application for employment Merrick stated that he had an eighth-grade education, had been a professional driver and hauler for 40 years and held a commercial driver's license, and that he had a spotless accident record.

II.    The Owner Operator Agreement

Piermatteo and Byrne approved Merrick to work as a independent contractor commercial driver for the Defendants,[1] and on February 11, 2004, Merrick and Byrne executed an Owner Operator Agreement.[2] The first page of the Agreement provided:

> In performing services under this Agreement, OWNER, except as ownership requires by applicable laws and regulations, shall direct the operation of equipment in all respects and shall determine the method, means, and

---

[1]At some point in 2003, the Defendants converted all company drivers to independent contractors, and determined that all future drivers would work as independent contractors only.

[2]Byrne signed the Agreement as Safety Manager of Florida Crushed Stone Company. For purposes of summary judgment, the Parties do not appear to dispute that the Agreement covered all of the Defendants.

manner of performance of this Agreement including, but not limited to, such matters as choice of routes, points of service of equipment, and rest stops. OWNER must comply with all federal and state regulations material to performance of their functions as independent contractors. The relationship between OWNER and FCS shall be that of independent contractor.

(Doc. 23, Ex. J, p. 1).

Under the terms of the Agreement, Merrick provided his own tractor and trailer, which he leased to FCS. (Id., pp. 1-3). He was not required to purchase or rent any products, equipment, or services from FCS. (Id., p. 5, ¶ 16). The parties also agreed and understood that FCS did not acquire any ownership or title to Merrick's equipment other than a lease holder's interest. During the life of the Agreement, FCS assumed "exclusive possession, control, use and complete responsibility for operation" of the equipment, provided, however:

such use and control shall be confined to the minimum extent necessary to meet the requirements of applicable Federal and State laws and for no other purpose whatsoever. This provision is set forth solely to conform with U.S. Department of Transportation ("DOT") regulations and shall not be used for any other purposes, including any attempt to classify OWNER or any driver provided by OWNER as an employee of FCS.

(Id., pp. 2-3, ¶ 4).[3]

The Agreement stated that Merrick would be compensated on a percentage basis for each load of materials he hauled and that Merrick "acknowledges and agrees that FCS does not guarantee any specific number of shipments or amount of revenue to OWNER during the term of this Agreement." (Id., pp. 1-2, ¶ 2). The Agreement further stated that

---

[3]See also Doc. 23, Ex. J, p. 4, ¶ 11.

FCS would make payments to Merrick within 15 days after he submitted all driver logs and documents necessary for the Defendants to obtain payment from their customers.  (Id.).[4]

Merrick agreed to maintain all of his equipment in a fully clean and presentable condition, and to permit FCS to furnish and attach to Merrick's tractor and trailer identifying markings, insignias, and/or slogans.  Merrick further agreed not to place any other markings, insignias or slogans on his tractor or trailer.  (Id., p. 3, ¶ 5).  Merrick was responsible for providing and continuously maintaining all of his equipment in good, safe, serviceable and efficient operating condition at his own expense, and was expected to pay for all operating expenses - including fuel, lubricants, oils, parts, repairs, accessories, tires, tubes, and safety equipment.  Merrick was also responsible for paying all equipment and vehicle licenses, as well as all federal and state governmental and regulatory bodies' taxes, cab cards, and permits.  In order to ensure compliance with DOT regulations, Merrick further agreed to make his equipment available for inspection by FCS, and to supply FCS with continuous six (6) month maintenance records.  (Id., pp. 3-4, ¶¶ 7, 10).

With respect to his driving services, Merrick agreed to be familiar and comply with all state and federal motor carrier safety laws and regulations, and also agreed that any drivers he hired on his behalf would be equally compliant.  If he, or any future drivers or employees he hired, incurred a fine or assessment for violation of any federal, state, or

---

[4]Merrick believes he was paid approximately 80% of the bulk rate charged for each delivery, with the remaining percentage going to the Defendants.

local laws or regulations, Merrick agreed to reimburse FCS for the amount of the fine and any related expenses.  The Agreement further provided that Merrick

> will dress appropriately, wear personal protective gear (hard hats, safety glasses, safety harnesses, etc.) where required during loading and unloading, behave in a professional manner and comply with all safety and operational rules and regulations issued by FCS or its customers.

(Id., pp. 3, 5, ¶¶ 8, 13).

The Agreement also clearly set forth Merrick's performance responsibilities:

> OWNER's obligation under this Agreement is to furnish to FCS a complete transportation service, including as may be necessary loading and unloading of the equipment, of the property tendered for transportation, from origin to destination, by a manner and means and over routes and in accordance with a schedule selected by OWNER and with respect to all trips offered to OWNER by FCS and which are accepted by OWNER.  This Agreement does not obligate OWNER to accept for transportation every or any trip offered by FCS to OWNER.  It is agreed that no additional fees shall be paid for loading and unloading the Equipment.  FCS and OWNER agree this Agreement does not create an employee-employer relationship. OWNER recognizes that in instances where he performs the driving and hauling operation of equipment, that he is not an "employee" of FCS, a defined in the state and federal laws regarding wage and hour and worker's compensation laws, and payments made to OWNER are not "wages" as defined by the Internal Revenue Laws of the United States. The parties agree that OWNER is also not an agent, partner, or joint venturer with FCS and FCS is only interested in the results of OWNER's performance under this Agreement.  OWNER recognizes that in instances where he contracts with another driver to perform the driving and hauling operations of Equipment, that driver is not an "agent," "servant," or "employee" of FCS, as defined by the federal and state laws regarding wage and hour, worker's compensation insurance, and payment of withholding and social security taxes, and that the OWNER is responsible for compliance with such laws and regulations.

> The OWNER shall furnish a driver for each unit, but FCS shall have the right to disapprove the use of any drivers including the OWNER, if such driver's safety record is unsatisfactory; or for any other reason that, in FCS's sole discretion, would detrimentally affect FCS.  FCS maintains safety records

based on reports from the Division of Motor Vehicles ("DMV") as well as through its own internal safe driving reporting procedures. FCS reserves the right to terminate this Agreement without advance notice to OWNER if, in FCS's determination, OWNER has operated FCS's equipment in an unsafe manner, OWNER's DMV record reflects a moving violation within the last twelve (12) months, or if OWNER has had more than one reportable instance of unsafe driving (as determined by FCS's internal safety procedures) within any twelve (12) month period.

(Id., p. 4, ¶ 12).

The Agreement mandated that Merrick attend three FCS safety meetings per year. Failure to attend a meeting constituted a breach of the Agreement, and FCS could immediately terminate the Agreement unless Merrick provided documentation substantiating that his absence was for good cause. The safety meetings were "designed to ensure compliance with the federal motor carrier safety requirements found in Title 49 of the Code of Federal Regulations and to provide a level of safety awareness to OWNER and its drivers that promotes public safety." (Id., p. 6, ¶ 19).

The initial Agreement period was for 30 days from the date of execution, which automatically renewed unless either party cancelled by giving one (1) day advance written notice to the other party. (Id., p. 2, ¶ 3). FCS had the right to immediately terminate the Agreement in the event Merrick engaged in an argument with an FCS customer, or was unable to arrive on time for loading and delivery of freight. (Id., pp. 3-4, ¶¶ 8-9). In the event of a breach of any term or obligation under the Agreement, the non-breaching party could terminate the Agreement, and, where practicable, serve written notice on the breaching party of the termination and reasons therefor. (Id., p. 7, ¶ 24).

III.    Merrick's Work for the Defendants

Merrick began working for the Defendants almost immediately after executing the Agreement, and did not engage in similar work for any other company. His tractor and trailer contained the Tri-State logo, the DOT number for Tri-State, and a notation that the vehicles were leased to Tri-State. Merrick would either call or receive calls from the Defendants' dispatchers who would tell Merrick what his route and cargo would be for that day, and the delivery time and location. Merrick never turned down a route offered to him.[5]

Merrick did not receive any paid vacation, holiday, or sick time, and the Defendants did not provide him with any group health, life, or disability insurance, or any 401(k) pension benefits. The Defendants never issued Merrick a W-2 form, but instead provided him with an IRS 1099 form at the end of the 2004 through 2006 tax years. Merrick filed his income tax returns as self-employed, and submitted an IRS Schedule C form to deduct all business expenses he incurred driving for the Defendants.[6]

The Defendants promulgated several policies and procedures for their drivers to follow, including: (1) Transport Safety Driver Handbook and Safety Manual; (2) Drivers' Code of Conduct; (3) Driver Accident Policy; (4) Personal Protective Gear Policy; (5)

---

[5]Merrick testified that he was not aware he had the option to refuse any routes. However, he also testified that he read and understood all of the provisions of the Owner Operator Agreement, and the Defendants have provided evidence that other drivers routinely exercised their right to reject routes offered to them. See Affidavit of Frank Byrne, Doc. 21-22, p. 2, ¶ 4.

[6]For the 2004 tax year, Merrick reported a net loss of $18,625. In 2005, he reported an adjusted gross income of $9,099, and in 2006, he reported an adjusted gross income of $18,868.

Inclement Weather Condition Policy; (6) Transport Safety Rider Policy; (7) Communications Device Policy; (8) Daytime Running Lights Policy; and (9) Speed Limits at Night Policy. (Doc. 23, Exs. O-W, Y). The Code of Conduct alone contained a list of 33 offenses, items, and acts that could subject a driver to immediate termination of their agreement. (Doc. 23, Ex. O). While many of these terminable offenses paralleled federal and state safety and regulatory requirements, several others set forth the Defendants' own requirements for operating their business. Similarly, the Handbook and Safety Manual, among other things, set forth the procedures by which truck drivers submitted their paperwork, and loaded and unload their cargo. (Doc. 23, Ex. W).

The Defendants required drivers to wear vests and proper protective clothing, including closed toed shoes, and to avoid sandals or boat shoes. (Doc. 23, Ex. P). The Defendants also set forth suggested guidelines, such as the Inclement Weather Condition Policy's four-step procedure for determining when weather conditions prohibited safe driving. (Doc. 23, Ex. Q). The Communication Device Policy provided a list of recommendations for when to use communications equipment, leaving the ultimate decision in the hands of the driver. (Doc. 23, Ex. R). The Speed Limits Policy stated that it was only a recommendation to drive at a speed less than posted during night hours, but mandated that drivers always drive at lesser speeds during unsafe conditions. (Doc. 23, Ex. T). Merrick received a copy of each of these policies, and signed an acknowledgment to comply with them.

As stated in the Owner Operator Agreement, the Defendants also monitored Merrick's driving abilities. This was done through the use of anonymous road patrols. Between February 2004 and September 2006, Merrick received 35 positive Safety Service Observation Reports, which noted that he displayed good driving skills and followed other motor vehicles at a safe distance. On three (3) occasions, he received reports of excessive speed. Merrick was never disciplined or counseled over these negative reports. Merrick also received driver training from the Defendants, and received awards from the Defendants for his safe driving. He attended all but one of the required safety meetings, which he was excused from due to a family illness.

IV.     Termination of the Owner Operator Agreement

In the early morning hours of August 31, 2005, Merrick was allegedly involved in a minor accident in Apopka, Florida. While changing lanes, Merrick's truck supposedly made contact with another vehicle, causing some minor damage. A safety manager from another terminal who was closer to the location of the incident was dispatched to the scene and took pictures of the victim's vehicle to verify the damage. When Merrick returned to the Brooksville Terminal, he met with Byrne to discuss the incident. Merrick denied that the accident occurred, although he admits that a vehicle had been flashing its lights at Merrick in an attempt to get him to stop.[7] Byrne inspected Merrick's truck and tires and observed lug nuts to have paint chips on them. Based on this evidence, the pictures of the victim's

---

[7]Merrick continues to deny that any accident occurred and believes that the person flashing his lights was trying to pull a scam on the Defendants.

vehicle, and Merrick's statements, Byrne concluded that Merrick had been in a "preventable" accident. Piermatteo and Byrne decided to suspend Merrick for a few days, but did not terminate the Agreement.

In mid-2006, Merrick told Piermatteo and Byrne that Merrick's wife and granddaughter were both terminally ill, and that Hospice was caring for them. Merrick requested that he be assigned to routes closer to home so that he could respond to any emergencies. In an effort to accommodate his request, the Defendants offered Merrick the Florida Rock route at least three times per week, which was one of the highest paying and most desirable routes. Piermatteo and Byrne also organized two fundraisers for Merrick's family, collecting approximately $2,800.

On September 8, 2006, a call came into the Defendants' safe driving line complaining that Merrick pulled out in front of a car. The driver had to slam on his or her brakes in order to avoid an accident. Byrne spoke to Merrick about the incident. At first he denied the incident, but ultimately admitted that he did pull out in front of a car, but that the car was "way back" and "hauling butt." Merrick also contended that the driver had plenty of time to slow down without slamming on his or her brakes. Byrne warned Merrick to be more careful in the future.

On or about September 19, 2006, Merrick was involved in a minor collision. Merrick was leaving a service station and thought he was clear to cross an intersection to make a left-hand turn. It was not until he was half-way out into a lane of on-coming traffic that he saw another truck, which had the right of way and was traveling at normal speed, headed

in his direction. The other driver, who also was working for the Defendants, attempted to drive around Merrick's tractor trailer, but the left rear trailer axle made contact with Merrick's right front bumper. Given the minor damage, both drivers decided not to file a police report. When Merrick returned to the Brooksville Terminal he made a formal report to the Defendants.

A few days later, Merrick met with Piermatteo and Byrne to discuss the accident. Merrick admitted that he did not see the other truck coming before he began his turn into the intersection. Merrick stated that the accident was his fault and accepted full responsibility. He also stated he would pay for the repairs to his truck.

At the conclusion of the meeting, Piermatteo and Byrne notified Merrick that the Owner Operator Agreement was terminated, effective immediately. Piermatteo and Byrne testified that they told Merrick the Agreement was terminated because Merrick was distracted due to his family members' illnesses, and that he did not have his head in the game and was becoming a safety risk.[8] Merrick, however, contends that Piermatteo also explicitly stated that the Agreement was terminated because of Merrick's age. Merrick further contends that Byrne suggested that Merrick tell everyone that he voluntarily quit,

---

[8]Byrne had a policy of terminating the agreements of any driver who was involved in at least two "preventable" accidents. See also Driver Accident Policy, Doc. 23, Ex. Y. The Defendants have submitted evidence that Byrne terminated the agreements of several other, substantially younger, truck drivers who were involved in one or more "preventable" accidents. Conversely, Merrick has submitted evidence that several substantially younger drivers were not terminated for their involvement in accidents (although the Defendants assert that these drivers were involved in "unpreventable" accidents). Merrick has also submitted the affidavit of another driver, who avers that Byrne denied him employment specifically because he was too old to drive. (Doc. 23, Ex. C).

and that Byrne would recommend Merrick for another job. Both Piermatteo and Byrne deny ever mentioning Merrick's age or suggesting that he say he quit; however, the Change of Status documentation prepared after the meeting states that Merrick quit with notice. (Doc. 23, Ex. A). Until the termination of the Agreement, Merrick considered Piermatteo and Byrne to be friends, and he has no other allegations of adverse treatment or age-based comments by anyone working for the Defendants.

## Summary Judgment Standard

Pursuant to Federal Rule of Civil Procedure 56(c), the entry of summary judgment is appropriate only when the Court is satisfied that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." In applying this standard, the Court must examine the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits and other evidence in the record "in the light most favorable to the nonmoving party." Samples on Behalf of Samples v. Atlanta, 846 F.2d 1328, 1330 (11th Cir. 1988). As the Supreme Court held in Celotex Corp. v. Catrett, 477 U.S. 317 (1986), the moving party bears the initial burden of establishing the nonexistence of a triable issue of fact. If the movant is successful on this score, the burden of production shifts to the non-moving party who must then come forward with "sufficient evidence of every element that he or she must prove." Rollins v. Techsouth, 833 F.2d 1525, 1528 (11th Cir. 1987). The non-moving party may not simply rest on the pleadings, but must use affidavits, depositions, answers to interrogatories, or other

admissible evidence to demonstrate that a material fact issue remains to be tried. <u>Celetex</u>, 477 U.S. at 324.

## **Discussion**

### I.    Employer vs. Independent Contractor Analysis

Rinker and FCS first argue that they are entitled to summary judgment because the undisputed facts show that Merrick, as a matter of law, was an independent contractor and not an employee as defined under the ADEA and FCRA.[9]  <u>See Daughtrey v. Honeywell, Inc.</u>, 3 F.3d 1488, 1495, n. 13 (11th Cir. 1993) ("The ADEA does not provide relief for discrimination against an independent contractor.").[10]

Courts have applied three tests when distinguishing between an employee and an independent contractor.  The first is the traditional common-law agency test, which focuses on the employer's right of control using a multifactored analysis.  <u>See Nationwide Mut. Ins. Co. v. Darden</u>, 503 U.S. 318, 112 S.Ct. 1344 (1992); <u>Community for Creative Non-Violence v. Reid</u>, 490 U.S. 730, 109 S.Ct. 2166 (1989).  The second test - typically more expansive - is the "economic realities" test, which holds that "employees are those who as a matter of economic reality are dependent upon the business to which they render service."  <u>Bartels</u>

---

[9]The legal analysis under the ADEA and the FCRA is the same. <u>Zaben v. Air Products & Chems. Inc.</u>, 129 F.3d 1453, 1455 n. 2 (11th Cir. 1997). <u>See also Hipp v. Liberty Nat. Life Ins. Co.</u>, 252 F.3d 1208, 1229 n. 31 (11th Cir. 2001).

[10]29 U.S.C. § 630(f) defines an "employee" as "an individual employed by an employer . . . ." 29 U.S.C. § 630(b) defines an "employer" in part as "a person engaged in an industry affecting commerce who has twenty or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year: . . . ."  The ADEA provides no further guidance as to the scope of the term "employee."  <u>Daughtrey</u>, 3 F.3d at 1495.

v. Birmingham, 332 U.S. 126, 130, 67 S.Ct. 1547, 1550 (1947); see also Dole v. Elliott Travel & Tours, Inc., 942 F.2d 962, 965 (6th Cir. 1991). The third test is a combination of the agency and economic realities tests, otherwise known as the "hybrid test," which considers the economic realities of the employment relationship but retains a focus on the employer's right to control. See Cobb v. Sun Papers, Inc., 673 F.2d 337 (11th Cir. 1982).

The Eleventh Circuit has not yet held which test should apply in ADEA claims, but has utilized both the hybrid and agency tests in non-ADEA cases. See Daughtrey, 3 F.3d 1488 (utilizing common-law agency test in ERISA claim); Cobb, 673 F.2d at 340-41 (utilizing hybrid test in Title VII claim). Moreover, every district court within this Circuit to address this question has applied the hybrid test. See Taylor v. BP Express, Inc., 2008 WL 5046071, No. CV 407-182 (S.D. Ga. Nov. 24, 2008); Smith-Johnson v. Thrivent Financial For Lutherans, 2005 WL 1705471, No. 8:03-CV-2551-T-30EAJ (M.D. Fla. July 20, 2005); Lockett v. Allstate Ins. Co., 364 F. Supp. 2d 1368 (M.D. Ga. 2005); Bates v. Variable Annuity Life Insu. Co., 200 F. Supp.2d 1375 (N.D. Ga. 2002); Fronduti v. Trinity Industries, Inc. , 928 F. Supp. 1107 (M.D. Ala. 1996); Gordon v. The Birmingham News, 1989 WL 222730, No. CV89-PT-0436-S (N.D. Ala. June 27, 1989).

Although the Court is inclined to also apply the hybrid test, it does not appear that the choice of test makes that much of a difference in the ultimate outcome in this case. Under both tests, the emphasis is on the hiring party's right to control the manner and means by which the work is accomplished. Daughtrey, 3 F.3d at 1496 (internal citations omitted). And, in this case, no matter which test is applied, the Court finds that there are

genuine issues of material fact which remain in dispute with respect to the level of control the Defendants held over the means and manner by which Merrick performed his duties.

Under the hybrid test, "the common law principles of agency and the right of the employer to control the employee" must be used to determine the employee's status, taking into account the "economic realities of the relationship." Cobb, 673 F.2d at 340-41. Among the common law factors that are to be considered are: (1) the intention of the parties; (2) the skill required in the particular occupation; (3) the party furnishing the equipment used and the place of work; (4) the method of payment, whether by time or by the job; (5) the type of employee benefits provided; (6) the manner in which the work relationship is terminated; (7) the importance of the work performed as a part of the employer; (8) the manner in which taxes on income are paid; (9) whether the work is done under the direction of a supervisor or done by a specialist without supervision; and (10) the length of time during which the individual has worked. Id. See also Smith-Johnson, 2005 WL 1705471 at * 3. In assessing the amount of control an employer exercises over the employee's work duties, courts look not only to the results that are to be achieved, but also to the "manner and means by which the work is accomplished." Daughtrey, 3 F.3d at 1496.

## A.    Common Law Agency Factors

Applying the common law factors to the undisputed facts taken in the light most favorable to Merrick, the Court finds that seven of the factors weigh in favor of independent contractor status, two weigh in favor of an employee/employer relationship, and one has

material issues of disputed fact.  The intent of the parties, which is manifested in the terms

of the Owner Operator Agreement; the skill required to be a commercial truck driver and

hauler;[11] the fact that Merrick had to provide his own tractor and trailer and paid for all

related expenses;[12] the fact that he was paid by a percentage of each delivery instead of

a salary;[13] the lack of any employee benefits; Merrick's ability to terminate the Agreement

at any time on one day's notice;[14] and the fact that the Defendants did not pay any of

Merrick's FICA, FUTA, or federal income taxes and provided him with an IRS 1099 form

all militate towards a finding of independent contractor status.[15]  See Taylor v. BP Express,

Inc., No. CV 407-182, 2008 WL 5046071 at ** 4-5 (S.D. Ga. Nov. 24, 2008); Lockett v.

Allstate Ins. Co., 364 F. Supp. 2d 1368, 1374-75 (M.D. Ga. 2005);  Smith-Johnson v.

Thrivent Financial for Lutherans, 8:03-CV-2551-T-30EAJ, 2005 WL 1705471 at ** 4-5 (M.D.

Fla. July 20, 2005);  Bates v. Variable Annuity Life Ins. Co., 200 F. Supp. 2d 1375, 1379

---

[11]See Bonnetts v. Arctic Express, Inc., 7 F. Supp. 2d 977, 981-82 (S.D. Ohio 1998) ("It is undisputed that driving a truck containing large loads of cargo requires a significant degree of skill. The job requires the skill of handling a large vehicle, detailed knowledge of the national roadways, and a high level of stamina to be able to make long trips without fatigue.")

[12]See Santelices v. Cable Wiring, 147 F. Supp. 2d 1313, 1320 (S.D. Fla. 2001) (noting that owning own equipment and tools used on job is analogous to independent contractor status).

[13]See John Cooper Produce, Inc. v. Paxton Nat'l Ins. Co., 774 F.2d 433 (11th Cir. 1985) (per curiam) (inferring independent contractor status from payment by commission).

[14] See Sica v. Equitable Life Assurance Soc'y of the U.S., 756 F. Supp. 539, 542 (S.D. Fla. 1990) (noting that equal ability to fire and resign shows independent contractor status).

[15]Cf. McKensize v. Davenport-Harris Funeral Home, 834 F. 2d 930, 934 (11th Cir. 1987) (deduction of social security, federal, and state taxes from plaintiff's commission checks demonstrated that plaintiff was not an independent contractor).

(N.D. Ga. 2002). <u>See</u> <u>also</u>, <u>Broussard v. L.H. Bossier, Inc.</u>, 789 F.2d 1158, 1160 (5th Cir. 1986); <u>Lalik v. Roadrunner Dawes Freight Systems, Inc.</u>, No. 4:07-CV-152-A, 2008 WL 1868320 at * 2 (N.D. Tex. Apr. 22, 2008). On the other hand, the seventh factor (the importance of the work to the Defendants' business) and the tenth factor (the length of the working relationship) weigh in favor of an employee-employer relationship. <u>See</u> <u>Lockett</u>, 364 F. Supp. 2d at 1375.

With respect to the ninth factor - whether the type of work was done under direction of a supervisor - the Court concludes that there are material issues of fact which cannot be resolved at the summary judgment stage. Merrick has presented substantial testimony and other evidence that a large portion of his duties were closely monitored and regulated, and that Piermatteo and Byrne were in charge of any disciplinary issues. In contrast, the Defendants have also presented evidence suggesting that Merrick was not supervised - he was given a route, a pickup and delivery time and location, and how he got there was up to him. Because this evidence is open to more than one interpretation, the Court cannot say whether the ninth factor weighs in favor of or against independent contractor status. Nevertheless, the Court concludes that the majority of the common law agency factors support a finding that Merrick was an independent contractor.

## B.    Right to Control

Even though the common law agency factors point towards independent contractor status, the Court must still analyze whether, and to what extent the Defendants had the

right to control Merrick's work - the most important factor to review under the hybrid test. See Cobb, 673 F. 2d at 340. In assessing this element of the hybrid test, the Court is mindful that when "an employer has the right to control and direct the work of an individual, not only as to the result to be achieved, but also as to the details by which that result is achieved, an employer/employee relationship is likely to exist." Id.; see also Daughtrey, 3 F.3d at 1496 (courts should look at the "manner and means by which the work is accomplished"). This is a fact intensive determination and, in this case in particular, one that must be left for the ultimate trier of fact to resolve.

Merrick points to the following: (1) the Defendants directed him to wear protective clothing and a vest; (2) the Defendants had exclusive use of his tractor and trailer and Merrick did not work for anyone else; (3) he was required to attend mandatory safety meetings; (4) he had to make his tractor and trailer available for safety inspections; (5) he was required to raise any issues he may have with his Terminal Manager; (6) he had to be reliable and deliver materials when and where the Defendants directed; (7) the Defendants closely monitored his driving abilities; and (8) the Defendants promulgated a wealth of policies and procedures governing all aspects of Merrick's work. According to Merrick, these facts demonstrate (or at least create an issue of material fact) that the Defendants controlled all aspects of his work.

While this is a close case, the Court agrees with Merrick. In each area Merrick references, the evidence submitted by both sides can be interpreted in two ways. On the one hand, it can be said that the Defendants' actions were an effort to comply with safety

and other regulations, and were not an effort to control the manner and means by which Merrick performed his duties. On the other hand, the evidence can be interpreted to show the Defendants supervised and controlled Merrick and treated him as an employee. The Defendants' policies and procedures in particular, which cover almost all aspects of commercial truck driving, can be read both to give the Defendants pervasive control over Merrick's work, and to merely provide guidelines and parallel applicable laws.[16] See N.L.R.B. v. Associated Diamond Cabs, Inc., 702 F.2d 912, 922 (11th Cir. 1983) (reasonable efforts to ensure compliance with governmental regulations do not evidence control "unless pervasive control by the employer exceeds to a significant degree the scope of the governmental control."). Given the conflicting interpretations of the evidence, the Court cannot say, as a matter of law, that the Defendants did not have the right to control Merrick's work and, therefore, the Court cannot hold that Merrick is an independent contractor.

### C.    Economic Realities

These same factual disputes also preclude resolution of the economic realities prong of the hybrid test because, under the hybrid test, the Court looks at the economic realities of the situation, but "the focus of the inquiry is the employer's right to control the 'means and manner' of the worker's performance." Lockett, 364 F. Supp. 2d at 1379 (quoting

---

[16]The Defendants contend that their policies and procedures are in large part recitations of applicable federal, state, and local laws and regulations governing commercial truck driving operations. However, the Defendants have presented no evidence establishing this factual conclusion, nor have they cited to any such laws or regulations.

Oestman v. Nat'l Farmers Union Ins. Co., 958 F.2d 303, 305 (10th Cir. 1992)). See also Taylor, 2008 WL 5046071 at *6. As discussed above, factual inferences remain in dispute as to whether or not the Defendants had the right to control the means and manner by which Merrick performed his driving services. Therefore, factual inferences also remain in dispute with respect to the economic realities of Merrick's work with the Defendants.

The Court acknowledges that the evidence submitted by both Parties is largely not in dispute. Rather, it is the application and interpretation of this evidence - *i.e.* the ultimate factual inferences that must be made - which is disputed. If the Court were the ultimate trier of fact in this case, the Court could make those factual inferences. However, the Court is not the ultimate trier of fact - the jury is. Summary judgment is appropriate only where no reasonable jury could find in favor of the plaintiff under any interpretation of the facts, and this is not such a case. Therefore, summary judgment shall be denied as to the Defendants' independent contractor argument.

II.     Age Discrimination Claim

Turning to the merits of Merrick's claim, the Court concludes that material issues of fact remain in dispute such that summary judgment is unwarranted. Merrick argues that his employment was terminated because of his age, and that he has both direct and circumstantial evidence to support his claim.

Direct evidence of age discrimination is "evidence which reflects a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee." Van Voorhis v. Hillsborough Cty. Bd. Of County Comm'rs., 512 F.3d 1296

(11th Cir. 2008). Merrick has presented evidence that Piermatteo explicitly stated to him that the Owner Operator Agreement was terminated because of Merrick's age. Such evidence clearly qualifies as direct evidence. See Price Waterhouse v. Hopkins, 490 U.S. 228, 277 (1989) (the plaintiff must produce "direct evidence that the decisionmakers placed substantial negative reliance on an illegitimate criterion in reaching their decision"). The fact that Piermatteo and Byrne deny that such a statement was ever made, and have put forth other reasons for Merricks' termination merely highlight the genuine factual disputes and credibility determinations that a jury must resolve, and mandate denial of summary judgment. See Wright v. Southland Corp., 187 F.3d 1287, 1303-04 (11th Cir. 1999); Buckley v. Hosp. Corp. Of Am., 758 F.2d 1525, 1530 (11th Cir. 1985). Cf. Hazen Paper Co. v. Biggins, 507 U.S. 604, 610, 113 S.Ct. 1701, 1706, 123 L.Ed.2d 338 (1993) ("It is the very essence of age discrimination for an older employee to be fired because the employer believes that productivity and competence decline with old age.").

The Court also finds that material issues of fact exist with respect to Merrick's circumstantial evidence *prima facie* case. To establish his *prima facie* case, Merrick must show that: (1) he was a member of a protected class; (2) he was subjected to an adverse employment action; (3) he was qualified for his position; and (4) a younger employee was treated more favorably under the same or similar circumstances. Morris v. Emory Clinic, Inc., 402 F.3d 1076 (11th Cir. 2005). Assuming Merrick is found to be an employee, then the first two elements are not in dispute. The last two elements, however, are heavily debated by both sides, and the inferences to be drawn from the facts remain in dispute.

Merrick has presented evidence that he was not involved in more than one preventable accident within a 12-month period; that the Defendants did not follow their own procedures when they terminated his Agreement; that younger drivers were not terminated for similar infractions;[17] that the Defendants' stated reason for terminating the Agreement conflicts with their exit documentation; and that both Piermatteo and Byrne have made ageist comments. This is more than enough to create genuine fact issues and prevent the entry of summary judgment.[18]

## **Conclusion**

Accordingly, upon due consideration, the Defendants' Motion for Summary Judgment (Doc. 21) is DENIED.

IT IS SO ORDERED.

DONE and ORDERED at Ocala, Florida this 25th day of August, 2009.

UNITED STATES DISTRICT JUDGE

Copies to:    Counsel of Record

---

[17]Merrick points to several truck drivers who were not terminated because Bryne determined they were involved in "unpreventable" accidents. Merrick argues that the determination of whether an accident is "preventable" or "unpreventable" is entirely subjective, and rests in the hands of Byrne, who is alleged to have made ageist comments on at least one prior occasion. Thus to credit the Defendants' evidence, the Court would have to give Bryne's testimony more weight than Merrick's, a determination that is not appropriate for summary judgment.

[18]This evidence and its inferences are also sufficient to call into question the Defendants' proffered legitimate, non-discriminatory reasons for terminating the Agreement, as well as to cast doubt over whether those reasons were pretextual.